Rivera., J.
(dissenting). The Second Circuit has certified to us three questions regarding the proper interpretation of section 296 (15) and (6) of the Executive Law (New York State’s Human Rights Law [HRL]), arising in an action by plaintiffs who allege they were terminated from employment based on their prior criminal convictions (Griffin v Sirva Inc., 835 F3d 283 [2d Cir 2016]). The majority’s approach disregards the express *189 statutory terms of the HRL and the legislative mandate that it be construed liberally to achieve its remedial antidiscrimination purposes. I therefore write separately to explain how the relevant sections should be analyzed in accordance with the text and legislative intent.
I.
The first certified question from the Second Circuit asks, “Does Section 296(15) of the New York State Human Rights Law, prohibiting discrimination in employment on the basis of a criminal conviction, limit liability to an aggrieved party’s ‘employer’?” (835 F3d at 294.) The answer, based on the language of section 296 (15), as confirmed by its legislative purpose, is no.
The HRL embodies New York’s strong public policy against discrimination (New York Inst. of Tech. v State Div. of Human Rights, 40 NY2d 316, 324 [1976]). As stated expressly in the Executive Law, the HRL “shall be construed liberally” to achieve its purposes (Executive Law § 300). To that end, “it is the duty of courts to make sure that the Human Rights Law works and that the intent of the Legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics” (City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 428 [1975]).
As one of several amendments issued over the years that expand the reach of the HRL, the legislature enacted section 296 (15), along with simultaneous amendments to the Correction Law, to serve as a general bar on unlawful employment discrimination against individuals with prior criminal convictions (Correction Law art 23-A; Matter of Acosta v New York City Dept. of Educ., 16 NY3d 309, 314 [2011]).[1] The new provisions were intended to “facilitate the obtainment of employment for ex-offenders and to aid their rehabilitation by eliminating many of the obstacles to employment” (Mem in Support, Bill Jacket, L 1976, ch 931). Beyond the obvious protection these provisions afford to individuals, the legislature recognized that improving the employment opportunities of the formerly convicted would benefit society. The sponsors’ supporting memorandum declared that “ [u] nemployment is the greatest deterrence to rehabilitation as statistics indicate that many *190 of the ex-offenders return to lives of crime because other employment is not available” (Mem in Support, Bill Jacket, L 1976, ch 931). The Governor’s memorandum similarly noted that
“[observers of our criminal justice system agree that the key to reducing crime is a reduction in recidivism .... The great expense and time involved in successfully prosecuting and incarcerating the criminal offender is largely wasted if upon the individual’s return to society [the individual’s] willingness to assume a law-abiding and productive role is frustrated by senseless discrimination” (Governor’s Approval Mem, Bill Jacket, L 1976, ch 931, 1976 NY Legis Ann at 418).
Thus, “[providing a former offender a fair opportunity for a job is a matter of basic human fairness, as well as one of the surest ways to reduce crime” (id.).
In furtherance of these dual goals, section 296 (15) sweeps broadly and declares:
“It shall be an unlawful discriminatory practice for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to deny any license or employment to any individual by reason of his or her having been convicted of one or more criminal offenses, or by reason of a finding of a lack of ‘good moral character’ which is based upon his or her having been convicted of one or more criminal offenses, when such denial is in violation of the provisions of article twenty-three-A of the correction law. Further, there shall be a rebuttable presumption in favor of excluding from evidence the prior incarceration or conviction of any person, in a case alleging that the employer has been negligent in hiring or retaining an applicant or employee, or supervising a hiring manager, if after learning about an applicant or employee’s past criminal conviction history, such employer has evaluated the factors set forth in section seven hundred fifty-two of the correction law, and made a reasonable, good faith determination that such factors militate in favor of hire or retention of that applicant or employee.”
By the text’s clear language, section 296 (15) is not limited to “employers,” but applies to any person or entity listed therein, *191 so long as that actor’s conduct violates article 23-A of the Correction Law. Thus, the first sentence of section 296 (15) identifies those subject to its proscriptions by the named category of actor, not by the actor’s relationship to the victim of the discriminatory conduct. Plainly, this evinces the legislature’s intent to cover unlawful conduct by employers and non-employers alike.
References to an “employer” found later in section 296 (15) confirm that this is the legislature’s intended construction. In the second sentence, “employer” is mentioned only with respect to an evidentiary rebuttable presumption established in section 296 (15) and applicable in cases asserting claims against an employer for the employer’s negligent employment actions. This part of section 296 (15) is directed at the only actor implicated by the rebuttable presumption, the employer. By contrast, the part that prohibits discriminatory practices — set forth in the first sentence — applies to “any person, agency, bureau, corporation or association,” making clear that these terms are not limited to an employer.
“It is an elementary rule of interpretation that all parts of an act are to be read and construed together to determine the legislative intent, and that all should be harmonized with one another” (Levine v Bornstein, 4 NY2d 241, 244 [1958]; see also McKinney’s Cons Laws of NY, Book 1, Statutes § 97). “[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea” (Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 [2012]). As the Second Circuit noted here, the fact that the term “employer” is “used twice in the second half of the provision makes its absence in the first half addressing discrimination even more glaring” (Griffin, 835 F3d at 290).[2]
*192 The legislature’s use of the term “employer” and “person” in other parts of the HRL, and its choice to refer to one over the other, confirms the word choice in section 296 (15) is by design. To take two examples, section 296 (1) (a) states it is a violation for “an employer or licensing agency” to “refuse to hire or employ or to bar or to discharge from employment” on the basis of “age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status.” Section 296 (3) (a) states it is unlawful for any “employer, licensing agency, employment agency or labor organization” to refuse to provide reasonable accommodations to known disabilities or pregnancy related conditions of “an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program.” In section 296 (15), the legislature expressly set forth a list of actors subject to its proscriptions. Nowhere in this list is “employer” mentioned. We must give meaning to every word when interpreting the statute, and harmonize its terms, but we cannot add words or interpret a statute in contradiction with the legislature’s express manifestations of its intent (see Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]).
Despite the commands of these rules of construction, and the words in the statutory text, the majority narrowly interprets section 296 (15) to apply only to employers based on what the majority calls that section’s incorporation of article 23-A (majority op at 182). This reflects a misunderstanding of the scope and purpose of section 296 (15) and the import of that section’s cross-reference to article 23-A. That cross-reference is meant to identify an HRL discriminatory practice by conduct and result, and is not intended as establishing the relationship of the offending actor to the aggrieved party.
A close reading of these two sections illustrates the proper inter-statutory construction. Section 296 (15) provides that it is an unlawful discriminatory practice for any person or listed entity
*193 “to deny . . . employment to any individual by reason of his or her having been convicted of one or more criminal offenses, or by reason of a finding of a lack of ‘good moral character’ which is based upon his or her having been convicted of one or more criminal offenses, when such denial is in violation of the provisions of article twenty-three-A of the correction law.”
This part tracks the language of Correction Law § 752, which provides that no employment shall be denied or acted upon adversely based on an individual’s prior criminal conviction, unless either of two exemptions set forth therein apply. These exemptions require the application of reasonable assessment standards to a person with a prior criminal conviction (see Governor’s Approval Mem, Bill Jacket, L 1976, ch 931, 1976 NY Legis Ann at 417). Keeping in mind the primary purpose of both the HRL and article 23-A is to eliminate employment barriers to those with criminal convictions in order to increase work opportunities and reduce recidivism, the logical interpretation of the statutory cross-reference is that the proscription targets all offending conduct, as a result of actions of employers and non-employers.[3]
The majority’s reliance on legislative history to support its alternative construction is misplaced. This Court has consistently held that legislative history should only be consulted where “the plain intent and purpose of a statute would otherwise be defeated” based on the “literal language of a statute” (Bright Homes v Wright, 8 NY2d 157, 161-162 [1960]), and here the literal language of the statutes are aligned with their legislative purpose of expanding opportunities and removing barriers to employment. Further, and contrary to the majority’s suggestion, mere mention in the legislative history of reasonable standards applicable to employers does not mean that the legislature intended to exclude actions by non-employers *194 from coverage. Otherwise article 23-A would not be couched in language specific to the outcome — i.e. denial of employment or adverse employment action — but would state simply that an employer cannot discriminate in employment based on a criminal conviction unless one of the two exceptions applies. Tellingly, section 753 places the responsibility of considering the exemptions squarely on the shoulders of an employer, as that is the entity in the position to determine whether the exemptions apply to the particular circumstances of the individual and the job (see Correction Law § 753 [1]).
Even if the majority were correct that article 23-A targets employers, the HRL is not so limited. The HRL seeks to ferret out discriminatory practices across a wide range of areas— public and private employment and housing; education; credit; public accommodations, resort and amusement; public services — and casts a wide net over those whose actions deny “every individual within this state ... an equal opportunity to enjoy a full and productive life” (Executive Law § 290 [3]; see Koerner v State of N.Y., Pilgrim Psychiatric Ctr., 62 NY2d 442, 449 [1984] [HRL has “broad, ameliorative purposes”]). To further the legislature’s anti-discrimination purpose in the area of employment, our interpretation of the HRL must be grounded in the realities of the modern workplace, especially the variegated shifts in employment relationships.
The changing nature of the employer-employee construct has a particularly adverse impact on job opportunities for persons with prior criminal convictions. Nontraditional employment structures are now commonplace, such that several persons or business entities are positioned to significantly affect the employment relationship (see Keith Cunningham-Parmeter, From Amazon to Uber. Defining Employment in the Modern Economy, 96 BU L Rev 1673, 1683, 1727 [2016]; Noah Zatz, Working Beyond the Reach or Grasp of Employment Law, The Gloves-Off Economy: Workplace Standards at the Bottom of America’s Labor Market 31, 37-42 [Annette Bernhardt et al. eds 2008]). For several reasons, large numbers of individuals with criminal histories have limited employment options and find themselves on the fringes of the labor market, and more reliant than other job applicants on temporary staffing companies (see Gretchen Purser, “Still Doin’ Time:” Clamoring for Work in the Day Labor Industry, 15 J Lab & Soc’y 397, 408 [2012]). Moreover, unlike when the legislature first adopted section 296 (15) and article 23-A, it is easier and less expensive *195 to do a background check and subsequently disqualify large numbers of persons based on the single question of whether the individual has ever been convicted of a crime, without any consideration of the individual’s circumstances and the nature of the job. The majority’s reading ignores that this is the exact scenario section 296 (15) — and article 23-A — seek to address (see Acosta, 16 NY3d at 314; Governor’s Approval Mem, Bill Jacket, L 1976, ch 931, 1976 NY Legis Ann at 417). Simply stated, the point of these statutes is to increase the likelihood that persons with criminal records will find work and live productive lives rather than return to a life of crime. Structural obstacles to that goal are the precise target of the legislative scheme.
The majority’s interpretation of section 296 (15) also relies on a flawed “incorporation” analysis that, by its terms, limits the class of employers subject to section 296 (15). Article 23-A defines “private employer” as “any person, company, corporation, labor organization or association which employs ten or more persons” (Correction Law § 750 [2]). By contrast, the HRL states that “employer” “does not include any employer with fewer than four persons in his or her employ” (Executive Law § 292 [5]). “Person,” meanwhile, is defined by Human Rights Law § 292 (1) to include “one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers.” There is an inconsistency between the two statutes, as section 296 (15) would apply to an employer that employs six persons, while article 23-A would not. Stated another way, the class of employers covered by article 23-A is smaller than the class of employers covered by HRL. If, as the majority reasons, only actions by employers who violate article 23-A are subject to section 296 (15), then fewer employers would be covered by its proscriptions, in direct contravention of the HRL. This interpretation oversteps the bounds of our judicial role as the body tasked with interpreting, not rewriting, the laws (Morgenthau v Citisource, Inc., 68 NY2d 211, 223 [1986]). Certainly this is not what the legislature intended when it made the policy choice to cover entities with a minimum of four employees.
The majority also fails to adequately explain why reference to “person” in section 296 (15) is limited to an employer, but the same term in section 296 (6) applies to any individual or entity, even absent an employment relationship with the aggrieved party (majority op at 187). It is counter to both the HRL’s *196 anti-discrimination goal and common sense to read the plain language of section 296 (15) narrowly, only to then adopt a definition of “person” that encompasses certain non-employers but not others.
For the reasons I have discussed, the proscriptions of section 296 (15) are not limited to an employer. Therefore, the first certified question should be answered in the negative, rendering it unnecessary to answer the second certified question.
II.
The majority has chosen to respond to the second certified question, as reformulated by my colleagues, to ask how a court determines whether an entity is an employer within the meaning of section 296 (15). While I do not believe the Court should reach this question, I write to explain my disagreement with the majority’s answer.
The majority states that a court must consider common-law principles, with an emphasis on the employer’s power to “order and control” the employee’s work performance (majority op at 186).[4] In some instances, this approach would broaden the definition of employer beyond the traditional direct employer (i.e. the entity that hires and compensates the aggrieved employee) to include a non-direct or indirect employer (e.g., corporate parents and franchisors). This theory of employer certainly brings the majority closer to the intent of the HRL in some cases, but the approach is still too narrow. Here, applying the four factors laid out in State Div. of Human Rights v GTE Corp. (109 AD2d 1082, 1083 [4th Dept 1985], quoting 36 NY Jur, Master and Servant § 2), with “greatest emphasis placed on the alleged employer’s power ‘to order and control’ ” the employee’s work performance (majority op at 186), it is unlikely that either defendant could be found to be an employer. Neither contributed to the selection and engagement of Astro employees, paid salary or wages, possessed the power of dismissal, or controlled Astro’s employees’ conduct (see majority op at 186). It *197 is even more difficult to see how Allied or Sirva would meet the test in Community for Creative Non-Violence v Reid (490 US 730, 751-752 [1989]) (majority op at 186).
The majority’s position could also be read to exclude certain non-employers who are able to adversely affect employment of a person with a criminal record or even to bar access to employment altogether. As the State points out, “background-check or credit-reporting agencies (which screen job applications on behalf of employers) have automatically disqualified job candidates with criminal histories and sent them rejection letters — thus preventing such candidates from even getting their foot in the door of the hiring process” (brief for State of New York as amicus curiae at 17-18). An employment agency does not have control over the worker’s employment terms, conduct, retention or dismissal, and does not pay the worker’s wages (see GTE Corp., 109 AD2d at 1083). Rather, these agencies serve as the gatekeeper between the applicant and the employer. In that gatekeeping role, they have an enormous impact on employment opportunities (see Sibley Mem. Hosp. v Wilson, 488 F2d 1338, 1341 [DC Cir 1973] [party who was an intermediary between employees and employers denied potential employees significant employment opportunities when exercising control of access to potential employers]). Exclusion of such actors from the proscriptions of section 296 (15) runs counter to its legislative purpose and ignores that over the years the legislature has continued to broaden coverage under the HRL to address the greatest expanse of discriminatory practices (L 1975, ch 803; L 1996, ch 204; L 2002, ch 2; L 2003, ch 106; L 2005, ch 75; L 2009, ch 80; L 2010, ch 196; see Margerum v City of Buffalo, 24 NY3d 721, 734 [2015, Rivera, J., concurring in part and dissenting in part] [discussing history of expansion]).
Of course if such actors were encompassed within the definition of employer adopted by the majority, the majority would have effectively come around to my view of section 296 (15), i.e. that this section covers employers and non-employers who are involved in the denial of employment, or adversely act upon an application or employment based solely on the fact of an individual’s prior criminal conviction. In any case, there are unforeseen consequences of adopting a definition of “employer” that may have broader application beyond these certified questions. We should be especially cautious about pronouncing a legal theory when it is unnecessary to do so and without input *198 from the State, which here declined to propose an answer to the second certified question regarding the definition of the term “employer.”
III.
The Second Circuit’s third certified question asks:
“Does Section 296(6) of the New York State Human Rights Law, providing for aiding and abetting liability, apply to § 296(15) such that an out-of-state principal corporation that requires its New York State agent to discriminate in employment on the basis of a criminal conviction may be held liable for the employer’s violation of § 296(15)?” (835 F3d at 294.)
That question must be understood, following the first and second certified questions, as an attempt to determine liability under section 296 (6) if this Court concludes that such an out-of-state actor would not be subject to section 296 (15). I would not answer the third question because the entity and conduct described would be covered under section 296 (15), as such an entity fits within the broad coverage of the statute as I have described it.
However, the majority has chosen to reformulate the question to address whether an out-of-state non-employer who aids or abets employment discrimination may be liable under section 296 (6) (majority op at 187). That reformulated question is no question at all because section 296 (6) applies to “any person” that aids or abets a discriminatory practice, and thus includes an actor who mandates discrimination, and, as the majority correctly states, the HRL, by its terms and in accordance with our case law, has extraterritorial reach (Executive Law § 298-a [1]; Hoffman v Parade Publs., 15 NY3d 285, 291 [2010]; majority op at 188).
To the extent the majority suggests in its discussion of National Org. for Women v State Div. of Human Rights (34 NY2d 416 [1974] [NOW]) that section 296 (6) may be read so broadly as to cover any actor with a tangential connection to discrimination writ large, I disagree. It is true that in NOW, this Court stated that the newspaper company did not “directly perpetuat[e] discrimination” based solely on its own actions (NOW, 34 NY2d at 421). However, the newspaper’s use of separate job listings based on sex aided and abetted sex discrimi *199 nation within the meaning of the HRL because the listings ensured the discriminatory outcome prohibited by law. As the Court explained,
“it is often the case that a person or organization acting in a manner which genuinely intends to be descriptive becomes in effect prescriptive. A policy purporting to reflect a statistical phenomenon actually becomes a self-fulfilling prophecy which helps to generate the very presumptive foundation for its existence. . . . Such sex discrimination, of course, is prohibited by section 296 of the Executive Law and those who aid or abet such unlawful discrimination are also chargeable with an unlawful discriminatory practice” (id. at 421).
Further, the employers who knowingly listed the jobs were, at a minimum, complicit in perpetuating “unlawful discrimination against women” (id. at 420), as without the employers’ submission of job announcements there would be no separate listings. Therefore, the case suggests that section 296 (6), liberally construed, requires engagement with or an attempt to influence a direct or non-direct actor to violate the HRL.[5]
The statutory language bears this out. Here, Astro is not an aider and abetter because it was plaintiffs’ direct employer, and cannot aid and abet its own direct discriminatory practice (Matter of Medical Express Ambulance Corp. v Kirkland, 79 AD3d 886, 888 [2d Dept 2010]; Hardwick v Auriemma, 116 AD3d 465, 468 [1st Dept 2014] [an individual cannot aid and abet his own violation of the HRL]). If Allied was not an employer within the meaning of section 296 (15), it would not have aided and abetted Astro’s termination of the plaintiffs because Allied’s rule required nonassignment to its jobs, not plaintiffs’ termination. Although it is possible that due to the significant economic value of Allied’s contract with Astro, Allied’s rule prohibiting plaintiffs from working on their moving jobs arguably compelled and coerced Astro’s discriminatory practice leading to plaintiffs’ termination, because an employer’s decision may fall within one of the exceptions set forth in *200 Correction Law § 752, Allied’s liability under the HRL is not certain.[6]
This analysis establishes that Allied may be liable either way, and we have come full circle again, because the only reason that Allied is liable is its status as an employer, broadly defined. The problem is this will not always be the case. As I have discussed, there will be entities that are not employers, but whose effect on employment results in unfair discrimination against persons with criminal convictions. Some of these actors may fall within the scope of 296 (6), but some may not because they will not be in a position to compel or coerce, and do not aid or abet because the employer is not aware of their actions and does not discriminate.[7]
IV.
The answer to the first certified question, based on the plain language and purpose of the HRL and section 296 (15), is that the proscriptions in this section are not limited to employers. That answer makes it unnecessary to consider the second certified question, but regardless, the majority’s approach is too limited and excludes certain actors who serve as obstacles to employment opportunities for persons with criminal convictions. As to the third certified question of whether an out-of-state actor who requires an in-state agent to discriminate may be liable under the aiding and abetting provision of section 296 (6), I would not answer the question because the out-of-state actor would be subject to the prohibitions of section 296 (15). Even if that were not the case, the language and the extraterritorial reach of the HRL requires the question as submitted to be answered in the affirmative.
Judges Stein, Fahey, Garcia and Wilson concur; Judge Rivera dissents in an opinion.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the *201 questions by this Court pursuant to section 500.27 of this Court’s Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, the first certified question answered in the affirmative and the remaining questions, as reformulated, answered in accordance with the opinion herein.

. The prohibition in section 296 (15) on discrimination in licensing is not at issue here.

. The majority’s explanation for why the legislature used the term “employer” only in the second but not the first sentence of section 296 (15) is an unnatural reading of this section and ignores every relevant rule of statutory construction (see e.g. McKinney’s Cons Laws of NY, Book 1, Statutes §§76 [ordinary-meaning canon], 114 [general-terms canon]; see also United States v Castleman, 572 US —, —, 134 S Ct 1405, 1417 [2014, Scalia, J., concurring] [presumption of consistent usage]). If, as the majority posits, the first sentence is intended to encompass “public and private employers,” why exclude these three words from the exhaustive list of those chargeable under section 296 (15) with a discriminatory practice? Surely it is not for lack of familiarity with these words and their intended application since the *192 legislature used the phrase “public or private employer” in article 23-A (Correction Law § 751). The most legally sound interpretation of section 296 (15) is that the legislature intended that each word be given meaning. Certainly the legislature could not have anticipated its selective list of entities would support a tortured construction of this section that is neither liberal, as mandated by Executive Law § 300, nor in furtherance of its general anti-discrimination purpose or its specific goal of increasing job opportunities by removing barriers to employment of persons with criminal records.

. The majority places great weight on the use of the preposition “at” in the first sentence of Correction Law § 751, which states, “[t]he provisions of this article shall apply to any application by any person for a license or employment at any public or private employer” (emphasis added). Interpreting this clause liberally, as the statute mandates (Executive Law § 300), leads to the conclusion that the provisions in article 23-A apply to any person’s application for any kind of employment at any employer. To read this clause to constrain the HRL so that “the application . . . must relate to a specific or otherwise identified employer” runs counter to the HRL’s direct interpretive guidance (Executive Law § 300; see also Post v 120 E. End Ave. Corp., 62 NY2d 19, 24 [1984] [statute remedial in nature “should be liberally construed to spread its beneficial effects as widely as possible”]).

. The majority relies on title VII in answering the second certified question to expand the category of parties who can be held liable for violations under section 296 (15), but title VII does not prohibit discriminatory practices against persons with criminal records as proscribed by the HRL. Indeed, “[a]s a precursor to the 1964 Civil Rights Act, the Human Rights Law is not modeled on title VII, and has certain significant distinctions that extend its coverage beyond that of title VH” (Margerum v City of Buffalo, 24 NY3d 721, 736 [2015, Rivera, J., concurring in part and dissenting in part]). In this case, title VII lends no guidance on the intent and purpose of the HRL.

. Even the report cited by the majority suggests that any person or entity subject to section 296 (6) must have sought to assist, instigate or reinforce a discriminatory practice, which according to the majority can only be accomplished by an employer (majority op at 187).

. Indeed, at trial in the district court, a jury found that Astro did not unlawfully violate the HRL (Griffin, 835 F3d at 287).

. On the other hand, if the majority intends to cover a person or entity who acts without direction from a direct employer — e.g., agencies who have internal protocols to maximize profit and maintain a certain reputation by choosing the least risky applicant, because those actors aid or abet discrimination or attempt to do so, and not because of some employment relationship (majority op at 187) — then every imaginable entity is covered. As I have discussed, and as the legislature wisely recognized, a more direct way to achieve that result is to read section 296 (15) to apply to both employers and non-employers.